JACKSON, *ex dem.* GOODRICH and others, *against* OGDEN and OGDEN.

By a map of the survey of a certain tract of land for which patents were issued, lots No.15. and No.16. were made to join each other, and by the mistake or fraud of the surveyor, according to the courses and distances of his survey, the line of lot No.15. would not extend to lot No. 16 but left a vacant piece of land between them; it *was held, that* after various mesne conveyances, during a lapse of near 18 years, the parties should be bound by their actual location, under their deeds, according to the metes and bounds given in the original survey, without reference to the map and patents.

What acts and declarations of parties will amount to such a practical location and construction by them, as to be binding and conclusive, though made under a mistake, as to the true extent of their legal rights.

THIS was an ejectment for lands in *Walton,* in the county of *Delaware.* The cause was tried at the *Delaware* circuit, in *September,* 1809, before Mr. Justice *Thompson.* The principal facts proved at the trial were the same as stated in the same cause, on a former motion for a new trial. (See 4 *Johns. Rep.* 140.)

It was admitted, that *S. Wattles,* to whom lot No. 16. was patented, had conveyed the lot to *John Harper,* who conveyed it, in 1790, to *James Hawley,* who in 1795, conveyed the same to *Robert Freeman* and another, all which conveyances referred to the map of partition.

The defendants produced a conveyance from *John Harper* to *Ansyl M'Call,* for 250 acres, part of lot No. 16. in 1793, described as " beginning at the north-west corner of *Thomas Hawley's* lot, and running thence north 60 degrees, east 34 chains and 32 links, then north 30 degrees, west 72 chains and 85 links, then south 60 degree,s west 34 chains and 32 links to the place of beginning."

*Benajah M'Call,* a witness, testified, that *A. M'Call* took possession immediately after the date of his deed; and the land between him and the river was in possession of the *Hawleys;* that he was acquainted with the *hemlock tree* mentioned in the deed, and that the *Hawleys* said that tree was their boundary, and *A. M'Call's* land was north-west; that the claim of the *Hawleys* did not extend to the premises in question; that *James Hawley* told him to what point his line extended, and it was not to the premises in question.

*Edmund Weed* testified that *M'Call* was first in possession, above 18 years ago; that he knew the cross-line

between lots No. 15. and 16., and that the corner was a hemlock tree; that *Robert Freeman* took possession after the *Hawleys*, and he said that the land in possession of the defendants was a vacant lot. This possession was the same as that of the *Hawleys*, except what was in possession of *Griswold*, and who said he had his possession from the *Ogdens*. The witness testified, that the *Hawleys* were in possession 18 or 19 years ago, but he never knew them claim the premises in question.

*Samuel Johnson*, another witness, testified that he was in possession of No. 15. twenty-two years ago, with *Goodrich*, and that they came there when *M'Call* last took possession of *Goodrich*, and they claimed to the west line of the *Ogdens*. There was a line of marked trees, which he supposed to be the east line of lot No. 15. They lived there five or six years. *Goodrich* always maintained that lot No. 15. extended up to lot No. 16. but never heard him say how far east No. 15. extended; that they frequently examined the east line of No. 15. and fixed it west of the possession of the defendants.

The judge charged the jury, that the lessors had made out a legal title to the premises in question, and that the only subject for their consideration was, whether the lessors had, by their acts, concluded themselves from claiming the possession; and declared his opinion to be that they had not done any thing to conclude them. The jury found a verdict for the defendants.

A motion was made to set aside the verdict, and for a new trial; which was argued at the last *August* term.

*E. Williams*, for the plaintiff.

*Foot*, contra.

KENT, Ch. J. delivered the opinion of the court. This is a motion on the part of the plaintiff to set aside the verdict, and for a new trial.

When this cause was heretofore before the court, on a like motion on the part of the defendants, a new trial was awarded to let in evidence of acts of the lessors of the plaintiff; and the court observed that there might be such acts as would be sufficient to conclude them. (4 *Johns. Rep.* 140.)

In considering the present motion, I shall take in one connected view such facts as have been presented to the court upon the former as well as upon the present motion, which remain uncontradicted.

Lots No. 15. and 16. in the patents in question, join each other, according to the map in the secretary's office; and the patents for those lots respectively refer to the map, and then describe each lot by courses and distances. But the courses and distances do not correspond with the map, and no doubt there is a vacant piece of ground (being the premises in question) lying between lots No. 15. and 16. provided those lots be located according to the courses and distances actually run, and the monuments actually established in the original survey made before the issuing of the patents. There was a supernumerary lot actually surveyed by *Wattles*, who run out the lots in the year 1785; and he run out 17 instead of 16 lots, and then, upon the map which he returned to the government, he omitted the 17th lot; and he took a patent for lot No. 16. and that patent, upon the face of it, and according to the map to which it refers, included the supernumerary lot.

It was, then, the mistake or the fraud of *Wattles*, which laid the foundation of the present controversy. *Wattles* conveyed lot No. 16. to *John Harper*, shortly after the date of his patent, and *Harper*, on the 10th *July*, 1790, conveyed lot No. 16. to *James Hawley*, from whom the lessors of the plaintiff derive title, and on the 12th *July*, 1793, a tract of land, described by metes and bounds, and containing 250 acres, and being the premises in question, to *Ansyl M'Call*, from whom the defendants derive title. The manner in which lot

No. 16. is described in the deeds to *Harper* and *Hawley*, is not stated in the case. We are not necessarily to conclude, that the lot No. 16. granted to *Hawley*, was commensurate with the lot No. 16. granted by patent to *Wattles;* for it does not appear, by the case, that the deed to *Hawley* referred to the patent, or adopted the description in it, with reference to the map on file in the secretary's office. It was competent for *Harper* and *Hawley* to limit the boundaries of lot No. 16. and make it less extensive than it would be if located by the map. The acts of the parties show that the lot, as granted by *Harper*, and as received by *Hawley*, was intended by them to be less extensive. Whether parcel or not of the thing granted, is matter of evidence. This was so held by the judges of the K. B. in the case of *Doe*, ex dem. *Freeland*, v. *Burt*, (1 *Term Rep.* 701.) and it will be found to be a strong authority on the point. If we assume the fact to be that the description followed the patent, the question will then be on the effect of the acts of the parties in locating their deeds. It is a mere question of location, and not of paper title. The courses and distances, and marked trees, spoke one language, and the map another. All the parties in interest from the year 1790 to the commencement of this suit, followed the actual survey, and took possession accordingly. They all considered the premises as a distinct lot, not included either in No. 15. or No. 16. They located according to the facts addressed to the senses, without having recourse to the secretary's office; and when the question of location was thus rendered ambiguous or uncertain, by the contradiction between the map and the survey, (and both were referred to in the patent and early deeds,) a practical location and construction given by the parties, and acquiesced in through a series of transfers, and for a great number of years, until the lands had become cultivated and had grown into value, cannot but operate with great, if not with decisive

NEW-YORK,
Nov. 1810.

JACKSON
v.
OGDEN.

force. It would be extremely inequitable for the plaintiffs now to be able to say, with the aid of the court, we have been all along under a mistake, and so have those from whom we derived title, and we have equally contributed to deceive the defendants, and him from whom they purchased; we can now go beyond our location, and the land which we supposed we had purchased, and can recover the defendant's farm, which we have constantly declared did not belong to us. On the motion for a new trial, for the mistake of a jury, the courts will always, in the exercise of a sound discretion, take some notice of the injustice of the claim. A man standing by and suffering another to build on his land, and setting up no right, though conusant of it, does, by this conduct, in equity, lose his land; (*East-India Company* v. *Vincent*, 2 *Atk.* 83.) and in one case, such conduct has been held, at law, in an action of ejectment, a forfeiture of his right. (*Tarrant* v. *Terry*, 1 *Bay's S. C. Rep.* 239.) Though I do not acquiesce in the last decision; yet these cases show how unfavourably such claims have been viewed by courts.

There is no doubt that when *James Hawley* purchased lot No. 16. in 1790, he took possession according to the original survey, and thus practically defined his boundaries. It was proved, that when *M'Call* took possession of the premises under his purchase from *Harper* in 1793, the *Hawleys* were in possession of lot No. 16., and they said that a certain hemlock tree was their boundary. This hemlock tree was one of the corners of lot No. 16. according to the original survey, and in exclusion of the premises. The premises lay north-west of this boundary, and *James Hawley* told a witness where his line extended to, and that it did not extend to the premises. These were the declarations of the owner of lot No. 16., cotemporary with the purchase and settlement of the premises by *M'Call.* The next owner of lot No. 16. was

*Freeman*, whose title commenced in 1795, and he said that the land which the defendant was on was a vacant lot. *Griswold*, one of the lessors of the plaintiff, and who was in possession of lot No. 16. as early as 1797, accepted a covenant under seal from the defendants, by which they agreed to sell to him 50 acres, being part of the premises, and *Griswold* afterwards said that he had this possession from the defendants. *M'Call* then took possession of the premises, with the knowledge and ac-quiescence of *Hawley*, and under a deed from the same person from whom *Hawley* derived his title. Every subsequent declaration and act of *Hawley* and his suc-cessors was calculated to strengthen confidence in the distinct titles derived from *Harper*, and it appears that the defendants were purchasers for a large considera-tion. It was incumbent upon *Hawley*, and those under him, to locate their deed truly, and to be conusant of its bounds. Here was uncertainty arising from the variance between the map and the actual survey, and the pro-prietors locate according to the latter, and hold out that to their neighbours, the possessors and claimants of the premises, as the true location. They go further: they purchase under the defendants' title. If these acts do not amount to a full recognition of that title, and con-clude them from now correcting that location, I think they are enough to justify this court in not actively in-terfering to help them, by disturbing the verdict of the jury. They ought, at least, to be left to commence their action *de novo*.

*Wattles*, the patentee, and every person without ex-ception, who has derived title from him, have acknow-ledged and acted upon the distinction between lot No. 16., as it appears upon the map, and the premises. *Wat-tles* himself created this distinction, and *Harper*, who took under him, supported this distinction, by his sepa-rate deeds to *Hawley* and to *M'Call*, and we have suffi-ciently noticed the declarations and acts of the subse-quent purchasers.

The owners of lot No. 15. lying west of the premises are also among the lessors of the plaintiff; but it would seem that lot No. 15. has no colour of pretension to the premises. The owners of that lot located it west of the premises; for it was proved that *Johnson* and *Goodrich* were in possession of lot No. 15. when *M'Call* took possession east of them, and they claimed as far as to the defendants' west line, and this was supposed to be the east line of lot No. 15. *Johnson* and *Goodrich*, the lessors, frequently examined the east end of lot No. 15. and fixed it west of the defendants' possession.

Upon every view of this case, the court are accordingly of opinion, that the motion on the part of the plaintiff for a new trial ought to be denied.

VAN NESS, J. (*dissenting.*) When this cause was before us, on a former occasion, (4 *Johns. Rep.* 140.) we all agreed that the premises in question were included within the boundaries either of lot No. 15. or of lot No. 16.; and that, as the lessors of the plaintiff had shown a title for both these lots, they had a right to recover, unless they had concluded themselves by establishing different boundaries from those given in the letters patent. The written agreement between *Goodrich* and the defendants, for the purchase by the former of fifty acres of the land, which was then supposed to lie between lots No. 15. and 16., was offered in evidence, on the former trial, as one, among other circumstances, to establish that the lessors of the plaintiff had thus concluded themselves; but the judge overruled it. We supposed that this agreement was admissible on the ground that " it might have been followed up by acts which would conclude *Griswold*, and those who derive title under him, from claiming the premises as within either of the lots;" and therefore lest " the defendants might have forborne to offer similar or inferior evidence of acts," &c. we awarded a new trial. Although the court did not ex-

pressly determine that if the agreement had been admitted in evidence, the plaintiff still would be entitled to recover, unless it was followed up by further evidence, yet it is clear that such was then our opinion. Now I cannot discover any facts in the present case which ought to lead to a different conclusion from the one we before arrived at, when this cause was before us on a similar application. The evidence on the former trial is not so fully reported as it might have been, nor was it necessary in the view we then took of the case.

But waiving what we before said on this subject, let us consider the cause as it now stands. The question is whether, upon the facts before us, the present claimants have said or done any thing, or acquiesced in what has been done by others, so as to devest themselves of their title to the lands in controversy. There being no dispute about the facts, this is a question of law. Owing to some cause which is not explained, and about which we are left entirely to conjecture, the person who surveyed the lots in question committed an error which created some confusion in relation to the line between No. 15. and No. 16. *Goodrich*, who resided in *Connecticut*, was ignorant of the true extent of lot No. 16., and therefore agreed to purchase the 50 acres mentioned in the case from the defendants. Those from whom *Goodrich* derived his title were also deceived with respect to the true line of division between No. 15. and No. 16. and expressed an opinion that neither lot embraced the premises in question. Some few years ago the error under which the proprietors of these lots laboured was detected, and the defendants now set up this misconception of the lessors of the plaintiff as a defence in this action, and the court consider the defence to be valid. This is going much further than we have ever yet gone, and, in my opinion, to a most dangerous length. The extent which we have hitherto gone is, that when two persons, already having a title, have settled the line

of division between them; or where one having title has made an actual location according to what he sup-posed to be his true line, and his neighbours have ac-quiesced in such location for a considerable length of time, that the boundary thus established shall remain undisturbed. But in this case my brethren go greatly beyond the principle of our former decisions. Here the defendants, confessedly, have no title at all; and the judgment of the court is, that the true and undisputed owners have not only lost their rights, but that the de-fendants, after a possession for about eighteen years, have acquired a title, which, it will be seen, is good against all the world. The government, it is conceded, have no claim to the property. The title must, therefore, be in some other person; and if it be not in the lessors of the plaintiff, then the defendants have it. It is thus that the acquiescence of those having the right, in ignorance of its actual extent, and a few loose parol declarations, are made to confer a title upon those who were tres-passers when they entered, and who otherwise would have no right at all.

There is another view of this subject which, it ap-pears to me, is equally conclusive against the defence which is relied upon. There can be no doubt that the lands in question fall within lot No. 16. One set of the lessors of the plaintiff derive title to that lot from *John Harper* by his deed of *July,* 1790. *Harper* had no title to No. 15. All the right he had was to No. 16., and the whole of that, as described in the letters patent, he had conveyed to *James Hawley* three years before the convey-ance to *Ansyl M'Call,* under whom the defendants claim. The parties thus derive their title from the same source. The defendants are in no better situation than *Harper* him-self would have been if he had remained in possession of the premises, and the present action had been commenced against him. Now it would seem to me that *Harper* never would be permitted to avail himself of the defence insisted

upon by the defendants; and if he would not, neither can the defendants. I am persuaded the more this view of the question is considered, the more conclusive it will appear against the defence which my brethren think it their duty to sanction.

If I understand the argument of the counsel for the defendants, they rely in a great measure upon the evidence of adverse possession, considering probably (as I most certainly did) that our former decisions (for this is the third time this cause has been before us) had disposed of every other point. There is no force in this objection; and the only reason why I omit going fully into a consideration of this part of the case, is, because I have never understood my brethren, in conferring with them on this subject, that they placed their opinion at all on this ground. My opinion is, that the verdict is against law, and ought to be set aside, with costs to abide the event.

Motion denied.