Where A. vo-
luntarily deliver-
ed up and de-
stroyed a lease
of land, and took
a new lease;
and afterwards,
claimed under
the old lease. It
was held, that if
the old lease was
not duly surren-
dered by writing,
within the sta-
tute of frauds, yet
that A. could re-
cover no more
land than what
he could prove,
with absolute
certainty, was
covered by that
lease, especially,
after the premi-
ses claimed had
been in the pos-
session of anoth-
er, for near six-
teen years.
A. on the 12th
December, 1793,
gave a lease to B.
of a part of a lot
of land for sixty
years; and on
the 26th Decem-
ber, 1793, exe-
cuted a deed in
fee for part also
of the same lot.
C. took imme-
diate possession,
under his deed,
and continued in
possession near
sixteen years; B.
afterwards claim-
ed part of the
premises in the
possession of C.
as comprised in
the lease to B.
It was held that
the deed to C.
was valid, notwithstanding the lease, and that B. could not set up any new location, so as to in-
vade the possession of C.

Every exception and uncertainty in a deed is to be taken favourably to the grantee.

JACKSON, ex dem. BUTLER and others, against GARDNER.

THIS was an action of ejectment, for part of lot No. 98. together with the waters and banks of the creek or stream running through it, for the use of the mills, in the town of *Manlius*, in the county of *Onondaga*. The cause was tried before Mr. Justice *Yates*, at the *Onondaga* circuit, in *June* last.

The following evidence was given, on the part of the plaintiff.

1. A power of attorney from *James Hamilton*, dated the 12th *December*, 1793, to *Adom Wood*, authorizing him to demand and sue for a set of grist-mill irons and other articles in the possession of *Phineas Stephens* and *Daniel D. White*, and to recover the rent of a saw-mill, lately erected by *Stephens*, and damages for cutting and carrying away any pine timber from a certain piece of land in *Manlius*, in the possession of *John Johnson*, &c.

2. A deed from *James Hamilton* to *Charles Mulhol-len* and his wife, dated 26th *December*, 1793, by which (for the consideration of five shillings, and of *Mulhol-len's* returning a deed of gift from *Hamilton* to him, of lot 55. in the 14th township of the military tract in the county of *Herkimer*) *Hamilton* conveyed to *Mulhollen*, in fee, part of lot 98. in *Manlius*, (containing 600 acres,) 200 acres of the north-east corner having been sold to *Stephens*, and 200 acres to *Wood*, and 40 acres to *Rose-mark*, both off the south-east corner; all the rest was granted to *Mulholen* and his wife and their heirs, to *have and to hold*, to the use of *Charles Mulhollen* and his heirs, &c. This deed was registered the 23d *April*, 1795.

3. A deed dated 23d *November*, 1796, from *James Hamilton* to *Charles Mulhollen*, by which, in consideration of love and affection, and the sum of five shillings, he conveyed to him part of lot No. 98. beginning at the north-east corner of *Stephens's* lot, and running thence, westerly along the line of *Stephens* to the creek and crossing it, and up the creek to the line of *Wood*, &c. &c. being 200 acres, and with a *proviso*, that the grantee shall not erect any mill on the water-course, under the penalty of forfeiting the land. This deed was registered the 7th *February*, 1797.

3. The copy of a *second lease*, (the original having been burnt by accident, and the first surrendered,) dated 29th *January*, 1794, from *James Hamilton*, by *Jonas Platt*, his attorney, to *Aaron Wood*, for 60 years, of two parcels of land in lot No. 98. in *Manlius*. The second parcel is described as bounded easterly by *Stephens's* land, southerly by the mill creek, westerly by lot No. 97. being all that part of lot No. 98. lying on the easterly side of said creek, except what had been sold to *Johnson* and *Stephens;* and also, so much of the bank on the west side of the creek, as may be necessary for the purpose of erecting mills and mill-dams, which part is to be surveyed and designated by *Moses Dewitt.*

5. A letter, dated *January* 25, 1794, from *James Hamilton*, in which he says, " Measure 200 acres, besides *Johnson's* and *Stephens's*, on this side of the creek, and on the other side, square out, as I intend to let it also. I mean what *Wood* does not take of the land." "Let Mr. *Wood* leave as much as is necessary for mills, on both banks of the creek, in his measurement."

5. *Thaddeus M. Wood*, a witness for the plaintiff, testified that he was present when the *first* lease was surrendered, and the second lease, above mentioned, given in its stead. The first lease was then destroyed, without any writing to show the surrender ; but the witness was not certain as to the manner in which the first lease was

surrendered and destroyed. The first lease was given by *Hamilton* to *Aaron Wood*, on the 12th *December*, 1793, for 200 acres of lot No. 98. to be taken from the south-easterly corner of the lot, so as not to interfere with the previous purchase of *Johnson*, of 40 acres, or that of *Stephens*, of 200 acres. It was the impression of the witness that the lease was to include the whole creek, and to continue for the term of 60 years, at an annual rent of seven pounds, for each hundred acres; and the witness thought he was a witness to that lease. *Dewitt* died in the summer of 1794, before any survey of the premises was made. On his cross examination, the witness said, " he would not undertake to say whether the first lease included the privilege of the whole-stream running across the lot; but, according to his impression, it did include it."

6. A certificate, or memorandum, by *Jonas Platt*, dated 29th *January*, 1794, endorsed on another instrument in writing, which was not proved, but which purported to be an assignment from *James Hamilton* to *Aaron Wood*, of his interest in a lease by him given to *Phineas Stephens*, for a saw-mill first erected, and was dated 12th *December*, 1793, and referred to a lease which had been given by *Hamilton*, of that date. By this certificate and memorandum, it appeared that a lease from *Hamilton* to *Aaron Wood* had that day been surrendered up by *Wood*.

7. *Jonathan Foster*, a witness, testified, that two or three days after the 25th *December*, 1793, he saw, at the house of *Aaron Wood*, a lease from *James Hamilton* to *Wood*, of 200 acres of land, in lot 98. in *Manlius*, to be taken from the south-east part, so as not to interfere with the farms of *Johnson* and *Stephens*; and to be surveyed by *Moses Dewitt*, in a square, as near as might be, southerly of *Stephens's* land, and to extend westerly over the creek, so as to make up the quantity. The creek throughout the whole lot was included in the lease, and the banks

NEW-YORK,
October, 1811.

JACKSON
v
GARDNER.

of the creek, at least as far as the north bounds of the 200 acres, if not farther, were also included for the use of the mills. The lease was for sixty years. He said that as the creek had not been traversed, it was not known whether the 200 acres would overrun the creek or not; but it was not to extend farther north than the south bounds of *Stephens's* line, to make up the 200 acres. He was not certain that the lease included the banks of the creek farther than the extent of the 200 acres.

8. *Elijah Phillips*, also, testified, that he saw the *first* lease in the latter end of the year 1793, or the beginning of 1794: it was for 200 acres out of the south-east corner of the lot 98. together with the creek and its banks throughout the lot, for the use of the mills. He said he saw the lease but once, and is not certain whether it was a lease or a contract for a lease; and he did not remember the exact boundaries, but the 200 acres were not to extend farther north than the south side of *Stephens's* land.

9. *James Geddes* testified, that if the 200 acres contained in the first lease, were so located as to include all the land south of *Stephens's* land, excepting *Johnson's* and extending westerly, with a north line corresponding with *Stephens's* south line, so far as to include the quantity of 200 acres, it would encroach on the defendant's farm, about 8 chains and a half, or 24 acres, leaving the defendant's mills, and about 11 chains and a half north.

10. *Garrit Van Slyck* testified, that the defendant was in possession some distance south of the line of the 200 acres, located as aforesaid; and was informed of *Wood's* claim to the water of the creek, when he took possession.

On the part of the defendants, *J. Platt* testified, that, as agent of *Hamilton*, he received from *Aaron Wood*, in *January*, 1794, a surrender of the first or old lease, or

contract for a lease, he was not certain which; and that it was destroyed, and a second or new lease given. Whether there was any agreement in writing to surrender, he could not recollect. It appeared that *Charles Mulhollen*, and those claiming under him, have had the entire and exclusive possession of all the land included in *Hamilton's* deed to *Mulhollen*, of the 26th *December*, 1793. That neither *Aaron Wood*, nor those claiming under him, have ever had possession of the lot, excepting the part which lies between *Stephens's* land and *Johnson's* land, and bounded westerly by the creek. *Mulhollen* lived on the land until his death, about five years ago, and made valuable improvements. It appeared that there were above 20 houses and many mills, erected on the premises.

A verdict was taken for the plaintiff, subject to the opinion of the court, on a case containing the facts above stated.

*Gold*, for the plaintiff. 1. By the lease of *Hamilton*, of the 12th *December*, 1793, a title to the 200 acres of land, and all the waters and banks of the creek, throughout lot No. 98. was vested in *Aaron Wood*. And it could not be affected by the deed to *Mulhollen*, of the 26th *December*, 1793, there being then an outstanding and subsisting title in *Wood*, under the first lease.

2. There is no evidence that the first lease was surrendered, by any express or *written* contract for that purpose. By the 10th section of the statute for the prevention of frauds, a surrender of a lease or interest in land must be in writing. (Sess. 10. c. 44.) On the contrary, the evidence of the giving up and destroying the lease, shows that there was not a surrender in writing. The word *surrender*, *ex vi termini*, means a surrender in writing. If an express surrender is relied upon by the defendant, he is bound to show it in writing. The

acceptance of a new lease does not necessarily imply a surrender of the old. In *Wilson* v. *Sewall*,* the court say, that the acceptance of a bad lease, is not an implied surrender of a good one.

In the case of *Roe* v. *York*,† the subject, as to the surrender of leases, is fully discussed, and all the authorities are cited. It is there held, that the mere cancelling or destroying a lease, is not a surrender of the term; and though a new lease was given, expressly in consideration of the surrender of the old, yet as the lessor had no power to give such a lease, the acceptance of the second lease was not deemed a surrender of the first, though the lessee knew of the defect of power.

In order that the acceptance of a new lease should produce a surrender of a former one, it should be for the same thing, or same premises.‡

Again, if *Hamilton's* deed to *Mulhollen* included the premises, then there was no reversion in *Hamilton*, on which the surrender could operate. A surrender is the yielding up of an estate for life, or for years, to him who has the immediate estate in reversion or remainder.§

Whether the delivering up, or cancelling a lease or deed, could extinguish the estate, appears to have been much discussed in *England*;¶ but it is now fully settled that it does not; and that, since the statute of frauds, it must be in writing.

Again, if the premises had not been excepted in the deed to *Mulhollen*, and there had been a technical surrender of the lease to *Wood*, *Hamilton* would not have been *estopped*, as between him and *Mulhollen*, to aver the truth, that the title, being then in *Wood*, could not pass to *Mulhollen*. Where an estate passes by deed, an *estoppel* cannot arise on it. If *A.*, a tenant for the life of *B.*, lease for years, and he purchases the reversion, and *B.* dies before the expiration of the lease, *A.* is not estopped, but may confess and avoid.**

NEW-YORK,
October, 1811.

JACKSON
v.
GARDNER.

* *Burr Rep.* 1975. 1980. and see *Hutton*, 105. Sir *Wm. Jones's Rep.* 405, 406. 1 *Saund.* 236. c. note (9).

† 6 *East*, 86.

‡ *Co. Litt.* 338. a. note(2). *Shep. Touch.* 301.

§ 3 *Bac. Abr.* 457. *Leases*, (8). 1 *Saund.* 235. c. note (9). *Co. Litt.* 337. a. n. (2.)

¶ *Co. Litt.* 338. note (1). *Gilb. Rep.* 236. 2 *Ch. Cas.* 100. 20 *Vin. Abr.* 143. *Surrend.* (L) pl. 10. 2 *Johns. Rep.* 84. 87.

** *Co. Litt.* 45. a. 47 *b*. *Bac. Abr. Leases*, (O.) 8 *Term Rep* 487. 1 *Burr.* 125.

NEW-YORK,
October, 1811.

JACKSON
v.
GARDNER.

*Estoppels* on conveyances with warranty, were introduced to prevent a circuity of action.* The doctrine is, that the grantor shall not allege that nothing passed by his deed, thereby making it a nullity; but he may allege that so great an estate did not pass. And if the defect of title is recited in the conveyance, there is no estoppel.†

3. *Mulhollen* never claimed the waters of the creek, or pretended to dispose of them; and he is estopped by the deed of *November* 23, 1796, to set up any mills, or to assert any title to the waters.

4. The deed of the 26th *December*, 1793, from *Hamilton* to *Mulhollen*, being a voluntary deed of gift, with a mere nominal consideration of five shillings, is void under the statute, as to the subsequent lease to *Wood*, which was given for a valuable consideration. A voluntary conveyance is void against a subsequent purchaser, for a valuable consideration, though such subsequent purchaser had notice of the voluntary conveyance. Though the universality of this proposition was once questioned, in *England*, it is now settled, as being a necessary doctrine to guard against fraud.‡ The words, " purchasers for money or other good consideration," in the 3d section of our statute, (sess. 10. c. 44.) and "for good consideration, and *bonâ fide*," used in the 6th section, are the same words as are used in the statute of 27 *Eliz.* c. 4.

A consideration, to be *valuable*, within the statute, must be, in some degree, adequate. Five shillings, and other valuable considerations, have not been held to amount to a valuable consideration, within the 27 *Eliz.*§

A consideration, which would raise a use to support a bargain and sale, is not sufficient to create a valuable consideration within that statute.¶ A lease on which rent is reserved, is considered as a revocation of a voluntary conveyance.**

* *Co. Litt.* 265. a.

† 1 *Lord Raym.* 729.

‡ *Newland on Contracts,* 391. *Rob. on Fraud. Convey.* 66. 213. *Shep. Touch.* 62, 63. (*Deeds, d. 4.*) *Cowp.* 278. 5 *Co.* 60. 2 *Bro. Ch. Cas.* 148.

§ *Sugden's Law of Vend.* 431. *Rob. on Fraud. Convey.* 373. *Cro. Eliz.* 445. *Salk.* 94. ¶ *Rob. on Fraud. Convey.* 474.

** *Cro. Jac.* 180.

5. It may be objected that the lease to *Wood* not being registered or deposited, pursuant to the act of *January*, 1794, extended to *May*, 1795, is void. But there was notice to *Mulhollen* of the lease, which is equivalent to a *registry* of it.*

*Clark* and *Platt*, contra. The lessors were bound to show a good title. The destruction of the old lease and its contents, ought to have been fully proved. The execution of the first pretended lease was not proved,† and none of the witnesses speak of its contents with any certainty. The acceptance of a new lease by *Wood*, shows that he did not rely on the old lease, in order to cover the banks of the creek, and the mill-seats. The surrender, by *Aaron Wood*, of the original lease, in *January*, 1794, enured to the benefit of *Mulhollen*, the reversioner. The evidence is sufficient to warrant the conclusion, that this surrender was by deed, or note in writing, according to the statute.

If it was not in writing, it was a surrender by act and operation of law. Surrenders in law, or surrenders by implication, remain as before the statute.

Surrenders are favoured in law.‡ No particular words are necessary to constitute a surrender; it may be collected from the intention of the parties, appearing on the instrument executed by them.§ It is a species of common law conveyance, and operates by *merger* of the *less* estate in the *greater*.

Delivering up a lease, and taking a new lease in writing, is a valid surrender; the new lease being of equal notoriety with a formal surrender in writing.¶

If a lessee for years takes a lease of the same premises, without delivering up the old lease, it is a surrender by operation of law.** *Fortior et equior est dispositio legis quam hominis.*

A surrender operates without an express acceptance, or even notice to the reversioner. His assent is implied.

NEW-YORK,
October, 1811.

JACKSON
v.
GARDNER.

* 4 *Cruise's Dig.* 353. *Newland on Cont* 509. 1 *Str.* 664. 3 *Atk.* 646. 2 *Ves.* 655. *Amb.* 624.

† 3 *Johns. Rep.* 303. *Gilb. on Ev.* 93.

‡ *Co. Litt.* 238. a.

§ *Shep. Touch.* 305.

¶ *Gilb. Eq. Rep.* 236. 4 *Bac. Abr.* (*Leases*,) 212.

** *Co. Litt.* 337. b. *Harg. & Butler's notes.* 2 *Roll. Abr.* 495.

NEW-YORK,
October, 1811.

JACKSON
v.
GARDNER.

It is like sealing a bond to a person, in his absence, which makes a valid obligation immediately, without notice, and can be annulled only by an express refusal.*

In *Mellow* v. *May*,† it was held, that if a lessee takes a new lease of the same land, it is a surrender of the first lease, although the second lease be void, from any defect in the making of it; for the acceptance of the new lease is a surrender of the old, which cannot be set up, although nothing was received for it. A contract for a new lease is good evidence to a jury, of a surrender.

The cases cited by the plaintiff's counsel, from *Burrow*, Sir *William Jones*, and 6 *East*, all rest on the ground of fraud : there was a *suppressio veri*. They are not applicable to the present case, where there is no pretence of fraud, but a fair disclosure of the previous conveyance to *Mulhollen*. The second lease is good and operative for all that part of the land, not previously sold to *Mulhollen*. No injury is done to the lessee, who is not obliged to pay rent, for the part in the possession of *Mulhollen*.

Again, here was no possession or rent paid for 16 years; and after so long and quiet possession by another, a surrender or regular re-entry will be presumed.‡

The cases cited by the plaintiff's counsel to show that *Hamilton* was not estopped from denying the effect of his deed to *Mulhollen*, have no application to the present case; because the delivering up the old lease, and taking a new one, did not operate as an assignment to *Hamilton*, but as a surrender to *Mulhollen*, the *reversioner*. The *term* was *merged* or extinguished, not *assigned*.

The deed of the 26th *December*, 1793, from *Hamilton* to *Mulhollen*, was for a valuable consideration, the returning a deed of gift of other lands, and five shillings. It must be intended, that the deed of gift was duly assigned, when the exchange was made. If not, a court of chancery would compel *Mulhollen* to execute a conveyance, on the ground of a performance by *Hamilton*; and this

* 2 *Salk.* 618.
*Bro. P. C.* 150,
151. S C Co.
*Litt.* 338. b.
† *Cro E x.* 873.
*Moore,* 636.
*Keb.* 285.

‡ 2 *Caines,* 382.
1 *Ch. Rep.* 108.
‡ *Vern.* 132. 195.

court may presume that to be done which ought to have been done, and which the party might be compelled to do.

But admitting it was a mere *voluntary* conveyance, it cannot be impeached by a subsequent deed for a valuable consideration; unless the second purchaser is a *creditor*, who has been defrauded by such voluntary conveyance.

Again, the leases to *Wood* were void, because not registered or deposited according to the act of 1795. (2 *Rev. Laws*, 262.)

*Hamilton's* deed of the 23d *November*, 1796, was produced at the trial, on the part of the plaintiff; and there was no evidence of *Mulhollen's* assent to it. If he did assent, as it was for the same premises, it amounted to a *confirmation*, not a surrender, of the first deed.

The claim or right to the *mill-stream* and its banks, for *the use of mills*, is a mere incorporeal hereditament,* and cannot be recovered in an action of ejectment. The right was contingent, and for a special purpose, and did not include a right to the soil. By a grant of a stream of water, the soil does not pass.† If by any natural cause, the stream should be diverted or dried up, the bed of the stream and the banks would belong absolutely to the grantor, as if no such lease had ever been made.

* 4 *Johns. Rep.* 83.

† *Co. Litt.* 4. b.

The *notices* given by *Butler* and *Philips* can have no effect; for they showed no title in themselves, or under *Wood*. They are to be regarded as mere *strangers* to the defendant.

If the evidence is fairly weighed, the balance will be found in favour of the supposition that the original lease did not include the stream throughout the whole lot; but only so far as the 200 acres extended.

Again, there is another and conclusive objection to the plaintiff's claim. *Aaron Wood* having *voluntarily destroyed* the original lease, has thereby destroyed his title.‡ He cannot be allowed to give *parol* evidence of its contents. Unless he can show that the lease was destroyed without

‡ *Shep. Touch.* 70. *Dyer*, 112. *Bac. Abr. Leases*, (T.) *Gilb. of Ev.* 03 115. *ib. o.* 27. b. *Com. Dig. Fait*, (E.)

NEW-YORK,    his own fault or assent, he must be held to the strict rule
October, 1811.
            which requires the highest kind of evidence ; otherwise,
JACKSON      the party might always elect whether to produce the
   v.
GARDNER.    *highest*, or the *lowest* species of evidence.

*Per Curiam.* The claim of *Wood* to the premises is
founded on the supposed lease of the 12th of *December*,
1793, and the lease of the 29th of *January*, 1794. He
shows no other title than what one or the other of these
leases may give him.

1. As to the lease of 1793. This lease was volunta-
rily surrendered by *Wood* to the agent of *Hamilton*, the
lessor, and destroyed on the 29th of *January*, 1794,
when he accepted of a new lease. Admitting that this
lease was not surrendered, in due form of law, accord-
ing to the requisition of the statute of frauds, so as to
devest *Wood* of his interest under it, yet the existence
and contents of this lease were not proved with sufficient
certainty to justify the plaintiff's claim. As *Wood* vo-
luntarily surrendered this deed to be destroyed, he
ought not to avail himself of any obscurity or uncertainty
in respect to its contents. Every difficulty and presump-
tion ought to be turned against him. He ought not to
recover any land under that lease, but what appears,
with absolute precision and certainty, to have been cover-
ed by it. And what is the testimony on this point ?
The proof of the execution of the lease is very loose.
*T. M. Wood* says, that he thinks that he subscribed it
as a witness; and there is much less proof that his in-
strument was an actual lease or conveyance of the land.
*Philips*, who saw it once, was not positive whether it
was a lease, or only a contract for a lease ; and *Platt*,
who received it, when surrendered, is equally uncertain on
this point. But the location and extent of the lands con-
veyed, is shrouded in absolute uncertainty. *T. M. Wood*
says it was for 200 acres, in the south-east corner of the
lot, but whether it was to include the whole creek, he

could not say, though that was his impression. The
land, he says, had not then been surveyed.  *I. Foster*,
who saw it in *December*, 1793, was not certain whether
it secured the banks of the creek farther than the extent
of the 200 acres; and he said it was not to extend
further north than the south bounds of *Stephens's* land; but
that as the creek had not then been traversed, it was
not known whether the 200 acres would run over the
creek, or not.  *E. Philips* confirms the grant of the same
bounds, though he adds that he did not remember the
bounds exactly.

To support a claim to the creek and lands of the
defendant, after a lapse of 16 years, upon such proof
of the contents of a lease, so long ago voluntarily de-
stroyed, by the consent of the party himself, and when,
perhaps, the evidence of a valid surrender in writing
existed on the lease, would be to create an extrava-
gant and dangerous precedent.  It was incumbent on
the plaintiff to have stated its bounds with precision,
or to have shown the reduction of those vague bounds
to certainty, by an actual location at the time.  There
would not have been any inducement to the surrender,
and for such anxiety as *Wood* discovered for a new
lease in *January*, 1794, if the first lease covered the
creek in question.  The plaintiff ought now to be con-
fined to such location of the 200 acres, in and adjoining
the south-east quarter of the lot, as can be made consist-
ently with the defendant's right; and there is land
enough for such a location.  It is not improbable that
the quantity of acres may have depended on the contents
of the land within certain definitive bounds, such, for
instance, as south of *Stephens's* land, and east of the
creek; and this supposition is the more plausible, because
it appears that *Wood* never actually exerted any owner-
ship or possession further west.

The title, then, to the premises, as founded on the first
lease, must fall to the ground, and this source of title

was properly abandoned upon the argument, by, one of the counsel for the plaintiff.(a)

2. The cause depends upon the operation and extent of the deed to *Mulhollen*, of the 26th of *December*, 1793; for if that deed does not cover the premises, the second lease to *Wood* undoubtedly does. No well founded objection can be made to the validity of this deed, and the single inquiry is touching its extent. It conveys the whole lot with the exception of *Stephens's* 200 acres, and " 200 acres to *M. Wood*, and *Rosemark's* 40 acres, both being taken off the south-east corner of said lot." This deed clearly conveys the land in dispute, unless it be contracted by the exception. But *Stephens's* 200 acres in the north-east corner, and the other 240 acres, can all be located, without any violent construction, so as not to touch the creeks, mills, or possessions of the defendant. In a case in which the location of the 200 acres is so extremely vague, this ought to be done, because the possessions taken at the time are to be considered as a practical location, by the mutual consent of the parties. It is an old principle of law, that exceptions in a deed, and every uncertainty, are to be taken favourably for the grantee. (*Co. Litt.* 183. a. 9 *East*, 15. 3 *Johns. Rep.* 387.) Now it appears that *Mulhollen* took possession, immediately, under his deed, and that exclusive possession has been had, and valuable improvements made, under that deed, on the lands in question, and that *Wood*, and those under him, have never possessed westerly of the creek, and of *Stephens's* 200 acres. He ought, then, at this day, to be restrained from setting up any new location, not absolutely necessary to give him his quantity of land, and which invades the possession of the defendant. *Mulhollen's* deed shows that the title to such possession is out of the lessors of the plaintiff. Judgment ought, therefore, to be rendered for the defendant.

Judgment accordingly.

(a) The reporter was absent, and did not hear the counsel in reply.