## JOHN KELLOGG *vs.* SILAS SMITH & others.

Certain Indians, in a grant of land, made a reservation of a tract, bounded north on a line some miles in length, "running a due west course" from a given point

In a controversy, arising more than a hundred years after, between parties own-
ing land on different sides of the Indian line, it was held, that evidence of gene-
ral tradition and reputation, and of the understanding and occupation of the
owners of lands bounding on the line, and of deeds made by them, and acts of
the legislature referring to the line, would warrant the jury in inferring that a
line, varying some degrees from a due west course, was located, laid out, assented
to and adopted by the parties; and that, if the jury did so find, the line, so esta-
blished, must be taken to be the true Indian line.

IN this case, which was tried before *Shaw,* ·C. J., and re-
ported by him, after a verdict for the plaintiff, for the consider-
ation of the whole court, the opinion exhibits all the facts.

*I. Sumner* and *C. N. Emerson,* for the defendants.

*W. Porter* and *F. Chamberlain,* for the plaintiff.

FLETCHER, J. This was an action of trespass *quare clausum
fregit,* for breaking and entering the plaintiff's close, situ-
ated in Great Barrington, and cutting and carrying away cer-
tain wood and timber. Both parties claim title to the *locus
in quo.*

It appears that certain Indians, by a deed dated the 25th
of April, 1724, conveyed certain lands to John Stoddard and
others, a committee appointed by the legislature of the pro-
vince to take the same, for the use of certain persons named
and described, and their associates. This grant embraced the
south west corner of Massachusetts; bounded south, on the
line of Connecticut; west, on the province of New York;
north, by a mountain named; and east, by a line nearly pa-
rallel to the Housatonic River, and about four miles east
thereof. It embraced the territory now including Sheffield,
Great Barrington, Mount Washington and Egremont. ·

In this deed, the Indians reserved for themselves a tract of
land between the Housatonic River and the west line of the
province, described as lying within two lines; one beginning
at a certain brook described, at its mouth, where it runs into
the Housatonic River, thence running a due west course to
a monument on Taghconic Mountain, on the line of New
York; and the other line, south of the last, commencing at a
point on Housatonic River, lower down, and at the mouth of
another brook, running parallel with the first line, in course
due west to the line of New York.

The great question between these parties is, where is the true north line of this Indian reserve, by which they are respectively limited.   The plaintiff claims the *locus in quo,* by virtue of a certain Joshua Roots's pitch, (through whose heirs and representatives the plaintiff claimed,) located and laid out by the proprietors of the Lower Housatonic Proprietary, the south bound of which was as follows: " Bounding south on the Indian line, the description being — the first bounds is a popple staddle and stones, standing on the north line of the Indian land."   The defendants claim under the deed of Charles Sage to Silas Smith, dated the 23d of February, 1835.   The boundary line of the lands granted by this deed is described as running from a point named, " north 2° east, sixty rods, to a monument of stones on the north Indian line, so called; thence east on the Indian line, one hundred and sixty seven rods, to a walnut tree, marked," &c.   The plaintiff under the Housatonic Proprietary does not claim any land lying south of the Indian line; and the defendants, claiming under the Indian reserve, claim no land north of the north Indian line.   The question, therefore, between the parties, as before stated, is, where is the true north line of the Indian reserve, by which they are respectively bounded?

No actual survey and location of this reserve is now produced; but some deeds and other instruments are produced made at a somewhat later period, alluding to such survey.   A great many deeds were produced, bounding estates on various parts of this line, in which it is described as being, instead of a line due east and west, west 5° 30′ north, or east 5° 30′ south, which is the line as claimed by the plaintiff. There are also some legislative acts, as the act incorporating the town of Great Barrington, by a line nearly coincident to the present dividing line between Sheffield and Great Barrington, which is west 5° 30′, north, or very near it.

The defendants contended that the true Indian line was a due east and west line, independent and exclusive of any traditionary or other evidence of a reputed line, or varying from a due east and west line.   On the other hand, the plaintiff insisted that the line on which the defendants' deed is

32 *

bounded, being "the Indian line, so called," is the line on which for a long period estates have been bounded, as the reputed Indian line, as understood and practically used by coterminous proprietors.

Upon this subject the jury were instructed as follows : " The question is, what the defendant Smith took by his deed from Charles Sage bounding the estate granted, north ' on the north Indian line, so called ? ' By the true construction of this deed, the grant must be bounded on the north, not necessarily by the line described in the Indian deed and the reservation contained in it, if the line, therein described as a due east and west line, was not the actual line by which the Indian land was practically laid off and located on the ground; that is, if it was not the line by which the Indians, by virtue of their reservation, actually occupied and held, on the one side, and the grantees, by virtue of their grant, held and occupied, on the other. If the general tradition and reputation, the understanding and belief, of those holding lands bounding on each side of the north line of the Indian reserve, for a great length of time, have been, that a certain line is the north line of the Indian reserve, and grants and conveyances have conformed to it as the Indian line, though not an east and west line, but a line varying a few degrees from it, this is evidence from which a jury may infer that a dividing line north, between the Indian reserve and the land granted, was located, laid out, assented to and adopted by the parties, as the dividing line and north line of the Indian reserve. If they do so find, the line thus defined, located and laid down, and long reputed and understood to be the true north Indian line, though not a due east and west line, must be taken to be the north Indian line, so called, and the north bound of the defendant Smith's grant, as contained in the deed from Sage, and he took no seisin or title north of that line."

Under these instructions, the jury, upon the evidence submitted to them, found a verdict for the plaintiff. The inquiry now is, whether or not the instructions were correct.

The learned counsel for the defendants assumed, in the argument, that the question as to the Indian line was a question

of construction of the Indian deed of 1724, and upon this assumption maintained that the evidence as to the actual line was not admissible, as tending to control and vary the deed. The infirmity of the argument was in assuming that the question was one of construction of the deed. The question was not one of construction of the deed, and the evidence had no tendency to vary or control the deed, and was not admitted or used for that purpose.

The evidence was admitted and used, to show that, in point of fact, a dividing line north, between the Indian reserve and the land granted, had been for a great length of time located, laid out, assented to and adopted by the parties as the dividing line and north line of the Indian reserve. Whether such a line had in fact been established by the parties was a question of fact, to be settled by the jury upon the evidence in the case. There can be no doubt that the evidence was competent to show the existence of such a line.

The jury have found, upon competent and sufficient evidence, that the parties had established such a line, which had long been held, and conformed to in grants and conveyances, as the Indian line; and the question now is, whether this line, thus established, may be totally disregarded and held of no avail, because it varies somewhat from the point of compass given in the Indian deed, and a line now be run according to the points of compass given in the deed, as for the first time, a century and a quarter after the making of the deed. It is believed that there is no principle or authority which would warrant such a proceeding.

It seems to be settled by a course of decisions of the supreme court of New York, that where the owners of adjoining lots of land settle and establish a division line between them by express parol agreement, and their agreement is immediately executed, and is accompanied and followed by actual possession according to such line, the agreement is binding and conclusive, and such division line shall not be disturbed, though it may afterwards appear, that it is not the true line according to the paper title. So when no express agreement is shown, long acquiescence by one proprietor in

the line assumed by the other is evidence, from which such agreement may be inferred. *Jackson* v. *Bowen*, 1 Caines, 358, 362; *Jackson* v. *Dysling*, 2 Caines, 198, 201; *Jackson* v. *Vedder*, 3 Johns. 8, 12; *Jackson* v. *Dieffendorf*, 3 Johns. 269; *Jackson* v. *Ogden*, 7 Johns. 238, 242; *Jackson* v. *Douglas*, 8 Johns. 367; *Jackson* v. *Gardner*, 8 Johns. 394, 406; *Jackson* v. *Smith*, 9 Johns. 100; *Jackson* v. *Mc Call*, 10 Johns. 377, 380; *Jackson* v. *Van Corlear*, 11 Johns. 123; *Jackson* v. *Freer*, 17 Johns. 29; *Rockwell* v. *Adams*, 7 Cow. 761, and 6 Wend. 467; *Mc Cormick* v. *Barnum*, 10 Wend. 104; *Dibble* v. *Rogers*, 13 Wend. 536. In most of these cases there had been a possession of more than twenty years, according to the line, but in several of them the possession had been for a less time than twenty years, there being no sufficient adverse possession to make a title, the decision depending on the force of the parol agreement, and the occupancy according to such agreement. No particular time appears to have been settled as necessary, during which such occupancy should have continued; and the length of the time of the occupancy was different in the different cases. The decisions in the cases referred to above were not overruled by the court of errors in *Adams* v. *Rockwell*, 16 Wend. 285, though the court of errors reversed the decision of the supreme court in that case, apparently on the ground that there was no evidence to show that a line had in fact been settled and established by agreement of the parties.

It has also been adjudged, by the superior court of Delaware, that a parol agreement, fixing a dividing line of lands, and ascertaining its position on the ground, with possession immediately following, is conclusive on the parties, and cannot be controverted; and that such an agreement is not within the statute of frauds. *Lindsay* v. *Springer*, 4 Harrington, 547. The same doctrine is held in other states. *Avery* v. *Baum*, Wright, 576; *Ebert* v. *Wood*, 1 Binn. 216; *Chew* v. *Morton*, 10 Watts, 321; *Gilchrist* v. *Mc Gee*, 9 Yerg. 455; *Gray* v. *Berry*, 9 N. H. 473.

It is not maintained in these cases that a title to any land is conveyed by the parol agreement. The decisions turn upon the binding form of the agreement. A division line, or divi-

sion fence, is regarded as the subject matter of a valid contract, in regard to which parties in interest may be so bound by their parol agreement, that a line so established, and accompanied by actual occupancy, cannot afterwards, at the will of either party, be disturbed or broken up. The mischievous consequences of a different doctrine entered into the considerations upon which these decisions were founded. Relying upon the permanency of a division line, established by deliberate and express agreement, a party might incur great expense in buildings or other improvements, or alienate land with covenants according to such line, and thus be exposed to great loss and injury, by unsettling a line thus voluntarily agreed on and settled.

But a different doctrine has been held in Vermont and Maine. *Crowell* v. *Bebee,* 10 Verm. 33; *Gove* v. *Richardson,* 4 Greenl. 327; *Colby* v. *Norton,* 1 Appl. 412.

In this court it was decided, in *Whitney* v. *Holmes,* 15 Mass. 152, that where a partition line was established by referees appointed by the parties, the parties were not concluded by the line thus settled, but that the matter was still open to litigation, and that one of the parties might show that his land extended beyond the line. But in *Goodridge* v. *Dustin,* 5 Met. 363, it was decided that a division line, settled by referees under a rule of court, was conclusive and binding on the parties. This decision was placed on the ground, not that the land passed by the award, but that by force of the agreement of the parties, they would not be permitted to allege facts contrary to those directly established by the award — that the award operated by way of estoppel. In *Tolman* v. *Sparhawk,* 5 Met. 469, it was held, that where owners of adjoining lands, intending to establish the divisional line according to the true boundary, agree by parol on a line that does not conform to such boundary, and afterwards hold possession according to such conventional line, such agreement, so made by mistake, and the possession under it, do not estop the party who has suffered by the mistake from asserting his title to the land that lies between the true boundary line and such conventional line, and recovering the same in a real action

seasonably brought. Thus it seems to have been decided in this court in one case, that a line fixed by referees was not binding and conclusive; and in another case, that a line fixed by referees was binding and conclusive; and in another case, that a line fixed by the parties themselves, by express agreement, was not binding and conclusive. But the case now under consideration belongs to a different class of cases, and is in no way affected by the decision in *Tolman* v. *Sparhawk*.

There is another class of cases resting upon a principle well established by numerous and uniform decisions. If a deed of land refer to a monument not actually existing at the time, and the parties afterward fairly erect such monument, intending to conform to the deed, the monument so placed will govern the extent of the land, although not entirely coinciding with the line described in the deed. *Makepeace* v. *Bancroft*, 12 Mass. 469 ; *Lerned* v. *Morrill*, 2 N. H. 197 ; *Kennebec Purchase* v. *Tiffany*, 1 Greenl. 219 ; *Waterman* v. *Johnson*, 13 Pick. 261, 267 ; *Frost* v. *Spaulding*, 19 Pick. 445 ; *Blaney* v. *Rice*, 20 Pick. 62.

There is another well settled rule, which governs a class of cases, to which the case now under consideration very clearly belongs. When, in a deed or grant, a line is described as running a particular course, from a given point, and this line is afterwards run out and located, and marked upon the earth by the parties in interest, and is afterwards recognized and acted on as the true line, the line thus actually marked out and acted on is conclusive and must be adhered to, though it may be subsequently ascertained that it varies from the course given in the deed or grant. The line thus actually marked out on the earth's surface controls the course put down on the paper. The instrument of conveyance is not understood as requiring that the line to be run shall necessarily be absolutely and precisely according to the course described, which would probably be quite impracticable, but that the line shall be fairly run, in a skilful and proper manner, and that the actual, practical result adopted and acted on, shall be conclusive upon the parties in interest.

Thus in the case of *Missouri* v. *Iowa*, 7 How 660, it

appeared that in an Indian grant of land to the United States, a line was described as running a due east course from a given point. This land was afterwards run out, and located and marked, under the authority of the United States, and the line thus marked out and located had been in various ways recognized and acted on as the true line. It was held by the supreme court of the United States, that this line, thus actually located, must be adhered to, though it was found that it varied some degrees from the due east course described in the grant. This decision fully and directly sustains the instructions of the court in the case now under consideration, as the two cases are substantially alike in their material facts. There are many other cases in which the courts have maintained and confirmed the same principle. *M'Nairy* v. *Hightour*, 2 Overton, 302; *Newsom* v. *Pryor*, 7 Wheat. 7; *Avery* v. *Baum*, Wright, 576; *Cowan* v. *Fauntleroy*, 2 Bibb, 261; *Young* v. *Leiper*, 4 Bibb, 503; *Buford* v. *Cox*, 5 J. J. Marsh. 582, 587; *Blasdell* v. *Bissell*, 6 Barr, 258; *Thompson* v. *McFarland*, 6 Barr, 478.

The wisdom and propriety of the rule thus established are very clearly and forcibly illustrated by the present case, in which it is settled by the verdict, that the actual line claimed by the plaintiff was located, laid out, assented to and adopted by the parties, as the dividing line and north line of the Indian reserve. No actual survey and location of the reserve is now produced, but some deeds and other instruments are produced, made at a somewhat later period, alluding to such survey. But however the actual line was established, it was, in fact, actually established by the parties, and to their satisfaction, and so remains to the present time, undisturbed, a century and a quarter from the date of the original deed. It must also be constantly borne in mind, that this was not the line of a single lot, but a line of a large territory of eight or ten or more miles in extent. There are various grants and conveyances and acts of the legislature during this long period, conforming to this actual existing line. The strongest reasons of propriety and policy, as well as the principles of law, forbid that such a line, thus established, should be disturbed after

having been established and conformed to for such a length of time. The length of this well known and ancient line renders it a matter of public and general concernment, that it should remain undisturbed. What would be the consequences of breaking up a line of this extent, and of this antiquity, to which grants and conveyances and acts of the legislature have conformed, it is impossible now to foresee. The only objection now made to the actual existing line is, that it does not exactly correspond with the points of compass as given in the original Indian deed. Probably the lines, as actually established, of a large portion of the estates in the commonwealth would be found to vary more or less from the points of compass as given in the original deeds. Variation of the compass, imperfection of the instrument, unskilfulness in the use of it, roughness of surface, and other causes, inevitably produce, in every instance, more or less uncertainty of result. Whether or not the parties intended to establish the line in this case, precisely according to the points of compass, as given in the original deed, does not appear. But it does appear, and has been settled by the verdict, that they did in fact establish a line satisfactory to themselves, which has remained unquestioned down to the present time, and no sufficient reason has been shown by the defendants why it should be now destroyed. The parties in interest themselves marked out on the earth's surface, where they would have the line mentioned in the deed, and there it must be; and with that line, those claiming under them, and coming more than a century after them, must be content.

The court are fully satisfied that, both on principle and authority, the instructions given to the jury were correct, and that judgment must be rendered on the verdict.